**WILLIAM MACKIN, ESQ., P.C.**
**105 N. BROAD STREET**
**SUITE 1**
**WOODBURY, NJ 08096**
(856) 848-2152
(856) 848-4280 Fax
bill.mackin@verizon.net
Attorney For Debtor Woodcrest Country Club

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
*(Camden Vicinage)*

|  |  |
|---|---|
| In re: | : |
|  | :  Chapter 11 |
| Woodcrest Country Club, | : |
|  | :  Case No.: 12-/ |
| Debtor(s). | : |
|  | : |

Irvin E. Richter, being duly sworn, hereby declares and certifies under penalty of perjury:

1.I am the President of Woodcrest Country Club ("WCC" or "Debtor") and I am authorized to make this certification in support of WCC's "First Day Motions (the "Motions").

**Background**

2.On May 9, 2012 WCC filed a voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.The Debtor is operating its business and managing its properties as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.No trustee or examiner has been appointed in this case. No official committee of unsecured creditors has been appointed in this case.

5.The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §

157(b)(2).

## Description of Debtor and Its Business

6. Debtor is a not for profit corporation which owns the real property located at 300 East Evesham Avenue in Cherry Hill new Jersey, identified on the Cherry Hill Township Tax Map as Block 528.0, Lot 11, consisting of +/-155.57 acres on which the Debtor operates an 18 Hole Golf Course with improvements and associated facilities including 2 additional holes for practice golf holes, a driving range, a 33,952 Square Foot clubhouse, a junior Olympic pool, a kiddy pool, a cabana, a snack bar, three lighted tennis courts, a cart storage barn, a maintenance shed, and a superintendent's residence (the "Real Property"). Debtor hosts parties and functions for members and guests at the Real Property.

7. Debtor also holds a Cherry Hill Township Club Liquor License # 0409-31-055-001 which currently expires on June 30, 2102 which entitles the Debtor to sell alcoholic beverages but only for immediate consumption on the Real Property and only to bona fide club members and their guests.

8. There are currently 360 dues paying members, including 224 golfers, 95 social members and 42 members in other categories, mostly long-time senior members.

9. The Debtor currently employs approximately 61 people, including 20 full-time employees (either salaried or more than 35 hours per week) and 41 part-time employees. Over the next few months the Debtor will hire an additional 15-20 seasonal part-time employees to handle tennis, pool and snack bar positions.

10. As of the Filing Date, there were functions booked through to generate additional operating revenues and Debtor is holding deposits from these parties.

## Secured Debt

11. On September 5, 2002 Debtor entered into a Building Loan Agreement with Sun National Bank ("SNB") wherein SNB agreed to loan Debtor an amount not to exceed $8,000,000.00 (the "Original Loan") for the purpose of constructing and equipping improvements to Debtor's Real Property.

12. To evidence its obligations under the Original Loan, the Debtor executed and delivered to SNB a Promissory Note in the amount of $8,000.000.00 (the "Original Note") dated September 5, 2002.

13. The Original Loan was secured by (a) a Mortgage, Security Agreement and Fixture Filing dated September 5, 2002 which was recorded on September 30, 2002 in the Camden County Clerk's Office in Book Mortgage Book 6039, Page 498 (the "Original Mortgage") which encumbered the Real Property; (b) a Security Agreement dated September 5, 2002 between the parties (the "Original Security Agreement"); and (c) an Assignment of Rents and Leases dated September 5, 2002 between the parties which was recorded on September 30, 2002 in the Camden County Clerk's Office in Mortgage Book 6039, Page 529 (the "Original Assignment of Rents and Leases"). The Original Note, the Original Mortgage, the Original Security Agreement and the Original Assignment of Rents and Leases are collectively referred to as the "Original Loan Documents."

14. On April 11, 2005 Debtor executed a Promissory Note with SNB in the original principal amount of $1,920,000.00 (the "Second Promissory Note").

15. The Second Promissory Note was secured by (a) a Mortgage, Security Agreement and Fixture Filing dated April 11, 2005 which was recorded on April 19, 2005 in the Camden County Clerk's Office in Book Mortgage Book 7796, Page 652 (the "Second Mortgage") which encumbered the Real Property; (b) an Amended Security Agreement dated April 11, 2005 between the parties (the

"Second Security Agreement"); and (c) an Assignment of Rents and Leases dated April 11, 2005 between the parties which was recorded on April 19, 2005 in the Camden County Clerk's Office in Mortgage Book 7796, Page 681 (the "Second Assignment of Rents and Leases"). The Second Promissory Note, the Second Mortgage, the Second Security Agreement and the Second Assignment of Rents and Leases are collectively referred to as the "Second Loan Documents."

16. On August 23, 2007 Debtor and SNB entered into a Note and Mortgage Modification Agreement which amended the Original Loan Documents and was recorded on October 19, 2007 in the Camden County Clerk's Office in Mortgage Book 8688, Page 1673 (the "Note and Mortgage Modification"). The Note and Mortgage Modification amended the Original Note and increased the amount of the Original Loan to $9,100,000.00 and permitted the Debtor to use the proceeds of such increase pay off the outstanding amounts due and owing under the Second Loan Documents.

17. On August 23, 2007 Debtor entered into a Secured Revolving Credit Loan Agreement with SNB (the "Revolving Credit Loan Agreement") wherein SNB agreed to increase the amount of an existing revolving credit loan to $1,570,000.00 (the "Revolving Credit Loan").

18. The Revolving Credit Loan was evidenced by a Revolving Credit Note dated August 23, 2007 in the original principal amount of $1,570,000.00 (the "Revolving Credit Note").

19. The Revolving Credit Loan was secured by (a) a Mortgage and Security Agreement dated August 23, 2007 which was recorded on October 18, 2007 in the Camden County Clerk's Office in Book Mortgage Book 8688, Page 1636 (the "Revolving Credit Mortgage") which encumbered the Real Property; (b) an Security Agreement dated August 23, 2007 between the parties (the "Revolving Security Agreement"); and (c) a second Assignment of Rents and Leases dated August 23, 2007 between the parties which was recorded on October 18, 2007 in the Camden County Clerk's Office in Mortgage Book 8688, Page 1667 (the "Revolving Credit Assignment of Rents and

Leases"). These documents are collectively referred to as the "Revolving Credit Loan Documents."

## Reasons For Filing

20. On September 24, 2010, SNB commenced an action in the Superior Court of New Jersey, Law Division, Cumberland County captioned as Sun National Bank v Woodcrest Country Club, Docket No. CUM-L-000964-10 (the "Law Division Action") alleging Debtor to be in default of its payment obligations to SNB under various loan agreements and asserting that approximately $11.5 million was now due and owing by the Debtor to SNB. The Debtor filed an answer denying the existence of a default, asserting numerous affirmative defenses and asserting counter-claims against SNB for among other things, tortious interference with prospective economic advantage, breach of covenant of good faith and fair dealing, breach of fiduciary duty with regard to agreements between the parties, intentional misrepresentations, breach of contract, negligence, conversion, tortious interference by SNB's board of directors, business defamation, and breach of confidentiality. No determination of Debtor's default has been made in the Law Division Action nor has there been any adjudication on any of the Debtor's counter-claims.

21. On October 13, 2010, SNB commenced a foreclosure action in the Superior Court of New Jersey, Chancery Division, Camden County captioned as Sun National Bank v Woodcrest Country Club, Doccket No. F-045718-10 (the "Foreclosure Action") alleging Debtor to be in default of its payment obligations to SNB under various loan agreements and asserting entitlement to foreclose on the Real Property. The Debtor filed an answer denying the existence of a default, asserting numerous affirmative defenses and asserting the same counter-claims against SNB as were asserted in the Law Division Action. After the Chancery Division summarily struck the Debtor's answer and counter-claims without adjudication on the merits, an appeal was taken. The Appellate Division has not yet conducted oral argument on the Debtor's appeal. However, the Appellate

Division did decline to enter a stay of the sheriff's sale of the Real Property scheduled for May 9, 2012 pending resolution of the Debtor's appeal.

22. These legal battles have been well publicized. Without a stay of the sheriff's sale, Debtor was required to file this chapter 11 proceeding to preserve its operations and assets and to reorganize.

23. The Debtor's Chapter 11 filing was also precipitated by a number of additional factors. Generally, golf courses throughout the United States are casualties of the recession. Many of its members have lost or had their savings, pensions, investments and/or 401(k) accounts reduced in value. Other members have faced economic setbacks with losses of employment and reduced income.

24. The Debtor has also experienced the effects of the recession but despite hard economic times been able to attract new membership and so is hopeful that despite the recession, it can survive and reorganize.

25. The Debtor's future depends on the ability to continue to use cash collateral to meet its ongoing operating expenses, including payroll, taxes, utilities and other operating costs. As long as the Debtor continues to operate, it can continue to attract new membership as well as alternative financing, by sale or third-party investment, including investments from current members, to accomplish a plan of reorganization.

26. Clearly, a key to any sale or third-party investment is the uninterrupted activity of the club for members, golf events and catered affairs. The good will of continued operations is critical in the purchase or financing of any golf club and catering facility going forward.

27. Without immediate ability to continue to use cash collateral already-booked catering affairs and future catering operations will be irreparably affected. During the peak season, the

Debtor provides many employment opportunities for caddies, servers and other professionals, and unless the Debtor is permitted to continue to use cash collateral and operate, these people will be suddenly confronted by the fact that they have no job opportunities for the summer.

    I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Date:   May 9, 2012                                                     /s/ Irvin E. Richter