**WILLIAM MACKIN, ESQ., P.C.**
**105 N. BROAD STREET**
**SUITE 1**
**WOODBURY, NJ 08096**
(856) 848-2152
(856) 848-4280 Fax
bill.mackin@verizon.net
**Attorney For Debtor-in-Possession**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
***(Camden Vicinage)***

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| Woodcrest Country Club | : | |
| | : | Case No.: 12-22055 JHW |
| | : | |
| Debtor(s) | : | |
| | : | |

**FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY WOODCREST COUNTRY CLUB**

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS ORIGINAL PLAN OF REORGANIZATION. THE PLAN PROPONENT BELIEVES THAT THIS PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE PROPONENT URGES THAT THE VOTER ACCEPT THE PLAN.**

Dated: January 18, 2013                    Woodcrest Country Club

                                           By: /s/ Irvin Richter
                                           Irvin Richter, President

1

## TABLE OF CONTENTS

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   A.   Purpose of This Document. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   B.   Confirmation Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      1.   Persons Potentially Eligible to Vote on the Plan. . . . . . . . . . . . . . . . . . . 7
      2.   Time and Place of the Confirmation Hearing. . . . . . . . . . . . . . . . . . . . . 8
      3.   Deadline For Voting For or Against the Plan. . . . . . . . . . . . . . . . . . . . . 8
      4.   Deadline For Objecting to the Confirmation of the Plan. . . . . . . . . . . . . 8
      5.   Identity of Person to Contact for More Information Regarding the Plan. . . 8
   C.   Disclaimer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   A.   Debtor's Business Description and History. . . . . . . . . . . . . . . . . . . . . . . . . . 9
   B.   Debtor's Pre-Petition Secured Financing . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   C.   Events Leading to Chapter 11 Filing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   D.   Management of the Debtor Before and During the Bankruptcy. . . . . . . . . . . . 13
   E.   Significant Events During the Bankruptcy. . . . . . . . . . . . . . . . . . . . . . . . . . 14
      1.   Bankruptcy Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      2.   Other Legal Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      3.   Actual and Projected Recovery of Preferential or Fraudulent Transfers
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      4.   Procedures Implemented to Resolve Financial Problems. . . . . . . . . . . . 18
      5.   Current and Historical Financial Conditions. . . . . . . . . . . . . . . . . . . . . 19

III. SUMMARY OF THE PLAN OF REORGANIZATION. . . . . . . . . . . . . . . . . . . . . . . 20
   A.   What Creditors Will Receive Under the Proposed Plan. . . . . . . . . . . . . . . . . 20
   B.   Unclassified Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      1.   Administrative Expenses and Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          (a)   Court Approval of Professional Compensation and Expenses
             Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          (b)   The Professional Claim Fund. . . . . . . . . . . . . . . . . . . . . . . . . . 22
          (c)   Payment From the Professional Claim Fund. . . . . . . . . . . . . . . . 22
          (d)   Option For Deferred Payment. . . . . . . . . . . . . . . . . . . . . . . . . . 23
      2.   Section 503(b)(9) Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      3.   Priority Tax Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
   C.   Classified Claims and Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      1.   Classes of Secured Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          (a)   Treatment of SNB's Secured Claim. . . . . . . . . . . . . . . . . . . . . . 25
          (b)   1111(b) Election by SNB. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      2.   Priority Non-Tax Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      3.   Classes of General Unsecured Claims. . . . . . . . . . . . . . . . . . . . . . . . . . 28
          (a)   Administrative Convenience Claims. . . . . . . . . . . . . . . . . . . . . . 28

        (b)     Trade Creditors and Suppliers. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        (c)     All Other Unsecured Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    4.    Classes of Bond Holders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        (a)     Proprietary Indentures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        (b)     Preferred Bond Holders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        (c)     The Voided Bond Holder Fund. . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.    Means of Effectuating the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    1.    Funding for the Plan.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        (a)     Capital Contributions From Existing Bond Holders. . . . . . . . . . 34

        (b)     Capital Contributions from New Proprietary Indenture Holders

               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        (c)     Capital Contributions from New Preferred Bond Holders.. . . . . 34

        (d)     The Member Mortgage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        (e)     The Plan Funding Escrow Account. . . . . . . . . . . . . . . . . . . . . . . 36

        (f)     Funding for the Professional Claims Fund. . . . . . . . . . . . . . . . 37

        (g)     Allowed Administrative Expenses (other than Professional Claims)

               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    2.    Post-Confirmation Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    3.    Disbursing Agent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

E.    Other Provisions of The Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    1.    Executory Contracts and Unexpired Leases. . . . . . . . . . . . . . . . . . . . . 38

        (a)     Assumptions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        (b)     Rejections.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    2.    Changes in Rates Subject to Regulatory Commission Approval.. . . . . 40

    3.    Retention of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    4.    Procedures for Resolving Contested Claims. . . . . . . . . . . . . . . . . . . . 41

    5.    Effective Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    6.    Modification.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    7.    Notices under the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

F.    Tax Consequences of Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

G.    Exculpation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

H.    Section 1146 Exemption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

I.    Heading, Article and Section References.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

J.    Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

K.    Successors and Assigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

L.    Payment Default.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M.    Presentation of Plan Distributions, Undeliverable Distributions.. . . . . . . . . . . . 45

N.    De Minimus Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

O.    Waiver of Avoidance Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

P.    Retention, Enforcement and Waiver of Claims. . . . . . . . . . . . . . . . . . . . . . . . . 46

Q.    Risk Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

R.    Acceptance or Rejection of Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

3

IV.      CONFIRMATION REQUIREMENTS AND PROCEDURES. . . . . . . . . . . . . . . . . . . . 48
         A.      Who May Vote or Object. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
                 1.       Who May Object to Confirmation of the Plan. . . . . . . . . . . . . . . . . . . . . 48
                 2.       Who May Vote to Accept/Reject the Plan. . . . . . . . . . . . . . . . . . . . . . . . . 48
                 3.       What Is an Allowed Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
                 4.       What Is an Impaired Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
                 5.       Who Is Entitled to Vote. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
                 6.       Completing and Returning Ballot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
                 7.       Revocation of Ballots. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
                 8.       Who Can Vote in More Than One Class. . . . . . . . . . . . . . . . . . . . . . . . . . 51
                 9.       Incomplete Ballots. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
                 10.      Waivers of Defects, Irregularities, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . 51
                 11.      Votes Necessary to Confirm the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
                 12.      Votes Necessary for a Class to Accept the Plan. . . . . . . . . . . . . . . . . . . 52
                 13.      Treatment of Nonaccepting Classes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
                 14.      Request for Confirmation Despite Nonacceptance by Impaired Class(es)
                          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
         B.      Liquidation Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
         C.      Feasibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

V.       EFFECT OF CONFIRMATION OF PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
         A.      Discharge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
         B.      Revesting of Property in the Debtor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
         C.      Confirmation Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
         D.      Modification of Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
         E.      Post-Confirmation Conversion/Dismissal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
         F.      Post-Confirmation Quarterly Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## I.   INTRODUCTION

Woodcrest Country Club ("Debtor") is the Debtor in a Chapter 11 bankruptcy case.  On May 9, 2012, Debtor commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Code"), 11 U.S.C. §101, et seq. Chapter 11 of the Code allows the Debtor, and under some circumstances, Creditors and other parties in interest, to propose a plan of reorganization.  The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtor is the party proposing the Plan sent to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT (the "Disclosure Statement") FOR THE PLAN WHICH IS ANNEXED HERETO AS **EXHIBIT A** (the "Plan").[1]

Under the Plan, Debtor seeks to retain its assets, reorganize and continue operations as a member-owned, not-for-profit golf course and country club.  In other words, Debtor seeks to accomplish payments under the Plan by providing payments to Creditors from cash on hand on the Effective Date, and from ongoing operations.  The Effective Date of the proposed Plan is 10 days after entry of the Confirmation Order.

### A.   Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Plan.

<u>**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**</u>

     **(1)**      **WHO CAN VOTE OR OBJECT,**

     **(2)**      **THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your Claim will receive if the Plan is confirmed),  AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

     **(3)**      **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

     **(4)**      **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

     **(5)**      **THE EFFECT OF CONFIRMATION, AND**

     **(6)**      **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The term "adequate information"  is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the Debtor to make an informed judgment about accepting or rejecting the Plan.  The Bankruptcy Court ("Court") has determined that the information contained in this Disclosure Statement is adequate, and it has

approved this document in accordance with Code Section 1125.

This Disclosure Statement is provided to each Creditor whose Claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor and to each Interest Holder of record as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.     Confirmation Procedures**

**1.     Persons Potentially Eligible to Vote on the Plan**

In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose Claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan. All Bond Holders of record as of the date of approval of this Disclosure Statement may vote on the Plan. The Ballot Form that you received does not constitute a proof of claim. If you are uncertain whether your Claim has been correctly scheduled, you should check the Debtor's Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, U.S. Court House, 401 Market Street, Camden, NJ 08101. The Clerk of the Bankruptcy Court will not provide this information by telephone.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND

INTEREST HOLDERS IN THIS CASE.

**2.      Time and Place of the Confirmation Hearing**

The Confirmation Hearing will take place before the Court on _____, at

_____ a.m. at the U.S. Post Office and Courthouse, 401 Market Street Camden, NJ 08101

**3.      Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

return the ballot in the enclosed envelope to William Mackin, Esquire, 105 N. Broad Street, Suite

1, Woodbury, New Jersey 08096.

Your ballot must be received by 4:00 p.m. on _____ (the "Voting Deadline"),

or it will not be counted.

**4.      Deadline For Objecting to the Confirmation of the Plan**

Objections to confirmation of the Plan must be filed with the Court and served upon William

Mackin, Esquire, 105 N. Broad Street, Suite 1, Woodbury, New Jersey 08096, so as to actually be

received on or before 4:00 p.m. on _____.

**5.      Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact  William

Mackin, Esquire, 105 N. Broad Street, Suite 1, Woodbury, New Jersey 08096.

**C.      Disclaimer**

The financial data relied upon in formulating the Plan is based on review of Debtor's

projections and consultation with its Professional Persons.  Debtor represents that everything stated

in the Disclosure Statement is true to Debtor's best knowledge as of the date of this Disclosure

Statement.

**PLEASE NOTE THAT APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.**

## II.    BACKGROUND

### A.    Debtor's Business Description and History

Woodcrest Country Club traces its roots to 1929 and became a member-owned not-for-profit corporation in 1948 when it acquired its current location at 300 East Evesham Avenue in Cherry Hill New Jersey, identified on the Cherry Hill Township Tax Map as Block 528.0, Lot 11, consisting of +/-155.57 acres on which the Debtor operates an 18 Hole Golf Course with improvements and associated facilities including 2 additional practice golf holes, a driving range, a 33,952 Square Foot clubhouse, a junior Olympic pool, a kiddy pool, a cabana, a snack bar, three lighted tennis courts, a cart storage barn, a maintenance shed, and a superintendent's residence (the "Real Property"). Debtor hosts parties, golf outings, charity events and functions for members and guests at the Real Property.  Debtor  holds a non-transferable Cherry Hill Township Club Liquor License # 0409-31-055-001 which entitles the Debtor to sell alcoholic beverages on the Real Property to Members and their guests.

As of May 1, 2012, immediately prior to the Petition Date, Debtor had 369 Members.  Since the Chapter 11 Case was filed, Debtor has been able to increase its membership.  There are currently 436 dues paying Members, including golfers, social and Members in other categories.

The Debtor employs approximately 61 people, including 20 full-time employees (either salaried or more than 35 hours per week) and 41 part-time employees.  During the Debtor's main seasonal months, between March and October, the Debtor hires an additional 15-20 seasonal part-

9

time employees to handle tennis, pool and snack bar positions. The maintenance of the golf course facilities are outsourced to Performance Golf Management and Consulting, LLC with several employees dedicated to maintenance of the Debtor's facilities.

## B.      Debtor's Pre-Petition Secured Financing

On September 5, 2002 Debtor entered into a Building Loan Agreement with Sun National Bank ("SNB") wherein SNB agreed to loan Debtor an amount not to exceed $8,000,000.00 (the "Original Loan") for the purpose of constructing and equipping improvements to Debtor's Real Property and to refinancing a pre-existing first mortgage. To evidence its obligations under the Original Loan, the Debtor executed and delivered to SNB a Promissory Note in the amount of $8,000.000.00 (the "Original Note") dated September 5, 2002.

The Original Loan was secured by (a) a Mortgage, Security Agreement and Fixture Filing dated September 5, 2002 which was recorded on September 30, 2002 in the Camden County Clerk's Office in Book Mortgage Book 6039, Page 498 (the "Original Mortgage") which encumbered the Real Property; (b) a Security Agreement dated September 5, 2002 between the parties (the "Original Security Agreement"); and (c) an Assignment of Rents and Leases dated September 5, 2002 between the parties which was recorded on September 30, 2002 in the Camden County Clerk's Office in Mortgage Book 6039, Page 529 (the "Original Assignment of Rents and Leases"). The Original Note, the Original Mortgage, the Original Security Agreement and the Original Assignment of Rents and Leases are collectively referred to as the "Original Loan Documents."

On April 11, 2005 Debtor executed a Promissory Note with SNB in the original principal amount of $1,920,000.00 (the "Second Promissory Note"). The Second Promissory Note was secured by (a) a Mortgage, Security Agreement and Fixture Filing dated April 11, 2005 which was

10

recorded on April 19, 2005 in the Camden County Clerk's Office in Book Mortgage Book 7796, Page 652 (the "Second Mortgage") which encumbered the Real Property; (b) an Amended Security Agreement dated April 11, 2005 between the parties (the "Second Security Agreement"); and (c) an Assignment of Rents and Leases dated April 11, 2005 between the parties which was recorded on April 19, 2005 in the Camden County Clerk's Office in Mortgage Book 7796, Page 681 (the "Second Assignment of Rents and Leases"). The Second Promissory Note, the Second Mortgage, the Second Security Agreement and the Second Assignment of Rents and Leases are collectively referred to as the "Second Loan Documents."

On August 23, 2007 Debtor and SNB entered into a Note and Mortgage Modification Agreement which amended the Original Loan Documents and was recorded on October 19, 2007 in the Camden County Clerk's Office in Mortgage Book 8688, Page 1673 (the "Note and Mortgage Modification"). The Note and Mortgage Modification amended the Original Note and increased the amount of the Original Loan to $9,100,000.00 and permitted the Debtor to use the proceeds of such increase pay off the outstanding amounts due and owing under the Second Loan Documents.

On August 23, 2007 Debtor entered into a Secured Revolving Credit Loan Agreement with SNB (the "Revolving Credit Loan Agreement") wherein SNB agreed to increase the amount of an existing revolving credit loan to $1,570,000.00 (the "Revolving Credit Loan"). The Revolving Credit Loan was evidenced by a Revolving Credit Note dated August 23, 2007 in the original principal amount of $1,570,000.00 (the "Revolving Credit Note"). The Revolving Credit Loan was secured by (a) a Mortgage and Security Agreement dated August 23, 2007 which was recorded on October 18, 2007 in the Camden County Clerk's Office in Book Mortgage Book 8688, Page 1636 (the "Revolving Credit Mortgage") which encumbered the Real Property; (b) an Security Agreement

11

dated August 23, 2007 between the parties (the "Revolving Security Agreement"); and (c) a second

Assignment of Rents and Leases dated August 23, 2007 between the parties which was recorded on

October 18, 2007 in the Camden County Clerk's Office in Mortgage Book 8688, Page 1667 (the

"Revolving Credit Assignment of Rents and Leases"). These documents are collectively referred to

as the "Revolving Credit Loan Documents."

**C.      Events Leading to Chapter 11 Filing**

On September 24, 2010, SNB commenced an action in the Superior Court of New Jersey,

Law Division, Cumberland County captioned as <u>Sun National Bank v Woodcrest Country Club</u>,

Docket No. CUM-L-000964-10 (the "Law Division Action") alleging Debtor to be in default of its

payment obligations to SNB under the various loan agreements and asserting that approximately

$11.5 million was  due and owing by the Debtor to SNB.  The Debtor filed an answer denying the

existence of a default, asserting numerous affirmative defenses and asserting Counterclaims against

SNB for among other things, tortious interference with prospective economic advantage, breach of

covenant of good faith and fair dealing, breach of fiduciary duty with regard to agreements between

the parties, intentional misrepresentations, breach of contract, negligence, conversion, tortious

interference by SNB's board of directors, business defamation, and breach of confidentiality.  No

determination of Debtor's default has been made in the Law Division Action nor has there been any

adjudication on any of the Debtor's Counterclaims. Debtor's estimate of the value of the

Counterclaims is approximately $4,500,000.00 in compensatory damages.  Debtor is also seeking

punitive damages.

On October 13,  2010, SNB commenced a foreclosure action in the Superior Court of New

Jersey, Chancery Division, Camden County captioned as <u>Sun National Bank v Woodcrest Country</u>

<u>Club</u>, Docket No. F-045718-10 (the "Foreclosure Action") alleging Debtor to be in default of its payment obligations to SNB under various loan agreements and asserting entitlement to foreclose on the Real Property.  The Debtor filed an answer denying the existence of a default, asserting numerous affirmative defenses and asserting the same Counterclaims against SNB as were asserted in the Law Division Action.  After the Chancery Division summarily struck the Debtor's answer and Counterclaims without adjudication on the merits, an appeal was taken (the "Foreclosure Appeal").  Although the Debtor requested a stay of the sheriff's May 9, 2012 sale of the Real Property pending resolution of the Foreclosure Appeal, the Appellate Division declined to stay the sale.  Without a stay of the sheriff's sale, Debtor was required to file this chapter 11 proceeding to preserve its operations and assets and to reorganize.

**D.      Management of the Debtor Before and During the Bankruptcy**

Debtor's Board of Directors was responsible for Debtor's operations prior to the filing of the Chapter 11 Case.  The Board of Directors has remained in control of Debtor's operations during the Chapter 11 Case and intends to remain in control of the Debtor's operations after confirmation of the Plan.  The current members of the Debtor's Board of Directors are:

| Name | Title |
|---|---|
| Irvin E. Richter | President |
| Peter Rosengard | Vice President |
| Steven Angstreich | Treasurer |
| Larry Burns | Secretary |
| Sy Mogel | Director |
| Harold Cohen | Director |
| Jack Ayers | Board Member |
| Fred Meyer | Past President |

### E.      Significant Events During the Bankruptcy

### 1.      Bankruptcy Proceedings

The following is a chronological list of significant events which have occurred during this

Chapter 11 Case:

| Date | Event |
|------|-------|
| May 9, 2012 | Debtor's Chapter 11 Petition filed |
| May 9, 2012 | Application to retain William Mackin as counsel for Debtor filed |
| May 10, 2012 | The following first day motions were filed with request for hearing on expedited basis:<br><br>- motion to authorize use of cash collateral<br>- motion to continue utility services and authorize deposits<br>- motion to permit Debtor to maintain current bank accounts<br>- motion to authorize payment of pre-petition wages and benefits<br>- motion to extend time to file missing schedules<br>- motion to authorize payment of pre-petition sales & use taxes |
| May 16, 2012 | Court hearing on first day motions. The following motions were granted:<br><br>- motion to continue utility services and authorize deposits<br>- motion to permit Debtor to maintain current bank accounts<br>- motion to authorize payment of pre-petition wages and benefits<br>- motion to extend time to file missing schedules<br>- motion to authorize payment of pre-petition sales & use taxes<br><br>The motion to authorize use of cash collateral was granted on an interim basis with a continued hearing date scheduled for May 31, 2012 |
| May 29, 2012 | Debtor files application to retain Laurence A Hirsh as appraiser |
| May 29, 2012 | Debtor files application to retain Steven Angstreich as special counsel to pursue Debtor's Counterclaims against SNB in the Law Division Action |
| May 31, 2012 | Order entered granting application to retain William Mackin as counsel for Debtor |
| June 1, 2012 | Second Interim Order Granting Motion To Use Cash Collateral entered with follow-up hearing rescheduled for June 25, 2012 |
| June 4, 2012 | Debtor files application to retain Alan Fellheimer as special counsel to pursue Debtor's appeal of the Foreclosure Judgment |
| June 4, 2012 | Debtor files Motion for Relief from Stay to continue state court proceedings (Law Division Action and Foreclosure Appeal) |
| June 6, 2012 | Debtor files remaining statements and schedules |
| June 11, 2012 | SNB conducts Rule 2004 examination of Debtor's financial controller, Andrew Creary |

| June 14, 2012 | Meeting of Creditors pursuant to 11 U.S.C. § 341 |
| June 15, 2012 | Continuation of SNB's Rule 2004 examination of Debtor's financial controller, Andrew Creary |
| June 15, 2012 | In telephone conference call the Court approves retention of both special counsel, Mr. Angstreich and Mr. Fellheimer subject to standards of review under 11USC 330, including consideration of benefit to the estate and source of payment. |
| June 15, 2012 | In telephone conference call the Court sets June 25, 2012 as the hearing date for further consideration of Debtor's application to retain Laurence Hirsh as appraiser to permit Debtor to propose a source of payment other than SNB's cash collateral |
| June 19, 2012 | Court enters orders approving retention of both special counsel, Mr. Angstreich and Mr. Fellheimer |
| June 21, 2012 | Court enters order approving Debtor's application to retain Laurence Hirsh as appraiser after telephone conference call in which Debtor proposes a source of payment other than SNB's cash collateral |
| June 25, 2012 | Hearings on motion for continued use of cash collateral and Debtor's Motion for Relief from Stay to continue state court proceedings rescheduled to July 2, 2012 |
| June 27, 2012 | Monthly Operating Report for Filing Period May 2012 filed |
| July 2, 2012 | Second Interim Order Granting Continued Use of Cash Collateral through December 31, 2012 entered on condition that Debtor provide SNB with monthly cash revenue reports. Order entered on July 30, 2012 |
| July 2, 2012 | Court grant's Debtor's motion for Relief from Stay to continue state court proceedings (Law Division Action and Foreclosure Appeal) |
| July 2, 2012 | Court schedules follow-up telephone conference call for July 9, 2012 to review status of Debtor's liquor license renewal application |
| July 9, 2012 | Telephone conference to review status of Debtor's liquor license renewal application - license has been renewed |
| July 18, 2012 | Debtor files Motion, on shortened time, to enter into Commercial Insurance Premium Finance and Security Agreement to finance certain insurance premiums |
| July 19, 2012 | Debtor files Application For Retention of Professional Weir & Partners, LLP as Special Counsel to assist in collection of unpaid accounts receivable |
| July 20, 2012 | Monthly Operating Report for Filing Period June 2012 filed |
| July 27, 2012 | Debtor files motion to establish procedures for settlement of certain pre-petition accounts receivable claims without need for further Court approval |
| July 30, 2012 | Order Approving Debtor's motion to enter into Commercial Insurance Premium Finance and Security Agreement entered |
| July 30, 2012 | Debtor files Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement |

| July 30, 2012 | Court enters Order Granting Application to Employ Weir & Partners, LLP as Special Counsel to assist in collection of unpaid accounts receivable |
| August 23, 2012 | Court enters Order Granting in part and denying in part Debtor's motion to establish settlement procedures for certain state court collection procedures |
| September 4, 2012 | Court conducts telephone conference call on SNB's application for shortened hearing on request for provision of financial information and documents from Debtor. Court requires Debtor to provide complete information, as requested by SNB by September 12, 2012 or a hearing would be held on that date, at which time the Debtor's controller, Mr. Creary, would be required to appear and testify about each item of information sought by the bank. |
| September 5, 2012 | Monthly Operating Report for Filing Period July 2012 filed |
| September 6, 2012 | Court enters Order Extending Debtor's Exclusive Periods In Which To File A Plan Of Reorganization And Solicit Acceptances Thereto Pursuant To Section 1121(d) Of The Bankruptcy Code. Exclusive time to file a Plan is extended to November 6, 2012. Time to solicit acceptances of a Plan is extended to January 7, 2013 |
| September 10, 2012 | Debtor provides all requested financial information and documents to SNB |
| September 13, 2012 | Debtor's counsel files first interim fee application seeking fees of $31,440 and expenses of $1,110.75 from 5/9/2012 to 9/10/2012 |

## 2.    Other Legal Proceedings

In addition to the proceedings discussed above, the Debtor is currently involved in the following non-bankruptcy legal proceedings:

| Court | Caption & Docket # | Description and Status of Matter |
| --- | --- | --- |
| Superior Court of New Jersey, Law Division, Cumberland County | Sun National Bank v Woodcrest Country Club CUM-L-000964-10 | SNB suit on note obligations and Debtor's Counterclaims against SNB. Stay relief has been granted to permit this matter to proceed before Judge Geiger. Deposition of designated representative is set for January 22, 2013 after which Debtor's Special Counsel will file motion for partial summary judgment. Debtor's Special Counsel has also filed a motion for leave to file an amended counterclaim to include additional individual counterclaim defendants. The return date for this motion is February 8, 2013. |
| Superior Court of New Jersey, Chancery Division, Camden County | Sun National Bank v Woodcrest Country Club F-045718-10 | SNB foreclosure action on mortgages secured by Debtor's real property. Matter stayed by Debtor's chapter 11 filing. Debtor's appeal of final judgment of foreclosure is pending in the Appellate Division. |

| Superior Court of New Jersey, Appellate Division | Sun National Bank v Woodcrest Country Club A-002805-11 | Debtor's appeal of final judgment of foreclosure. Debtor filed its appellate brief on September 27, 2012 and an amended appellate brief, with court permission, on October 12, 2012. The matter is awaiting the filing of SNB's appellate brief. |
|---|---|---|
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v Mr. & Mrs. Jay Berman SC-000971-12 | Pre-petition collection matter. Default judgment of $1,795.00 awarded to Debtor. |
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v Anthony Casa DC-007244-12 | Pre-petition collection matter. Settlement arrangement between parties for payment of $3,718.87 in monthly installments of $100.00. Payments have not been received. Matter is to be referred to Special Counsel for further collection activities. |
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v Stephen Esposito DC-007239-12 | Pre-petition collection matter. Debtor claims $7,306.98 to be due. The matter has been settled for $4,500.00. |
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v Alan & Miriam Feldman SC-00972-12 | Pre-petition collection matter. Default judgment awarded to Debtor. Default judgment awarded to Debtor in the amount of $321.00. |
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v Paul Langivan SC-00974-12 | Pre-petition collection matter. Default Judgment awarded to Debtor in the amount of $2,166.92. |
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v Jason Langheim DC-007242-12 | Pre-petition collection matter. Default Judgment awarded to Debtor in the amount of $3,203.15. |
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v Lance Stopek DC-007372-12 | Pre-petition collection matter. Default Judgment awarded to Debtor in the amount of $5,500.00. |
| Superior Court of New Jersey, Camden County Law Division, Special Civil Part | Woodcrest Country Club v. Fred Berlinsky DC-013944-12 | Pre-petition collection matter. Debtor claims $4,766.16 to be due. The matter is pending. |

### 3.       Actual and Projected Recovery of Preferential or Fraudulent Transfers

Question 3b of Debtor's Statement of Financial Affairs, which is on file with the Clerk of

the Court, reflects a number of pre-petition payments to vendors, suppliers, for utility costs, for insurance premiums, for course maintenance and for real estate taxes in the total amount of approximately $372,529.  Question 3c of Debtor's Statement of Financial Affairs, which is on file with the Clerk of the Court, reflects a number of pre-petition payments to insiders in the total amount of approximately $35,823.  These are gross amounts which Debtor believes would be substantially, if not totally, reduced by affirmative defenses available to the recipients of these pre-petition payments.  Because of the significant defenses available, and the negative impact that pursuing Avoidance Actions against current suppliers would likely have on Debtor's operations going forward, Debtor has determined to waive the pursuit of Avoidance Actions against the recipients of payments identified in the Statement of Financial Affairs upon the Effective Date. Aside from the pre-petition payments identified in the Statement of Financial Affairs, Debtor is unaware of the existence of any other Avoidance Actions that could be pursued either as preferences under 11 U.S.C. § 547 or as fraudulent transfers under 11 U.S.C. § 548.

### 4. Procedures Implemented to Resolve Financial Problems

Debtor has taken several steps in an effort to remedy the problems that led to the bankruptcy filing.  To increase annual revenues, Debtor has continued to increase Club membership.  When the bankruptcy case was filed Debtor had 369 Members.  This number has increased and Debtor currently has 436 Members. Debtor has received approximately 77 additional inquiries from prospective new Members who have indicated that they would seriously consider becoming Members once the Debtor's Chapter 11 Plan was confirmed.

To further increase annual revenues, Debtor has continued to seek to  attract additional golf events, outings, parties and other bookings so as to maximize the capacity utilization of its dining

18

room and bar facilities.  Debtor currently has approximately 20 golf outings already confirmed for

the 2013 season, and approximately 33 Members events confirmed so far for the 2013 season.  The

Debtor has also received many other contacts and inquiries for bookings and events which the Debtor

believes will result in additional revenue once the Plan is confirmed and the cloud of Chapter 11 is

removed.

Debtor has also engaged in expense reductions since the filing of the bankruptcy case. These

changes, along with Capital Contributions and loans to be obtained from Bond Holders and Club

Members to retire Debtor's financial obligations to SNB, other pre-petition Creditors, other expenses

and to  provide working capital, as outlined in the Plan will enable Debtor to continue operations

going forward.

### 5.      Current and Historical Financial Conditions

Debtor's assets, consisting primarily of the Real Property and the personal property,

inventory, and equipment used in connection with the operation and maintenance of the Country

Club, have total value of $3,400,000 all as more fully detailed in the July 3, 2012 appraisal

performed by Laurence A. Hirsh and Evan Prostovich of Golf Property Analysts (the "GPA

Appraisal"). [2] The GPA Appraisal reflects the continued going-concern value of Debtor's assets as

a member-owned, not-for-profit company consistent with the recent Third Circuit Court of Appeals

opinion of In re Heritage Highgate, Inc., 679 F.3d 132 (3d Cir. 2012) and does not reflect the

liquidation value of the Debtor's assets.

These assets are fully encumbered by SNB's mortgages and security interests. SNB has filed

---

[2]  The GPA Appraisal is voluminous and therefore, not attached to the Disclosure
Statement.  Copies of the GPA Appraisal will be made available upon request to Debtor's
counsel.

19

secured proofs of claim in excess of $11,000,000. As a result, the secured portion of SNB's Claims, measured by the value of Debtor's assets is $3,400,000 with the balance, in excess of $7,000,000, being unsecured.   Debtor's Schedule E, filed with the Clerk of the Court, reflected priority Unsecured Claims of approximately $133,000.   Debtor's Schedule F, filed with the Clerk of the Court, reflected General Unsecured Claims, apart from the unsecured portion of SNB's Claims, of approximately $1,530,820.89.   These Claim amounts may be reduced after resolution of Claims Objections and the offset of Debtor's Counterclaims against SNB.

A copy of the most recently filed Monthly Operating Report is attached hereto as **Exhibit B** reflecting Debtor's historical financial operations since the Petition Date.

### III.    SUMMARY OF THE PLAN OF REORGANIZATION

**A.    What Creditors Will Receive Under the Proposed Plan**

The Plan classifies Claims and Interests in various Classes, states whether each Class of Claims or Interests is Impaired or Unimpaired and provides the treatment each Class will receive under the Plan.

**B.    Unclassified Claims**

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has not placed the following Claims in a Class. The treatment of these Claims is provided below.

**1.    Administrative Expenses and Fees**

Administrative Expenses are Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed under Code Section 503(b) and fees payable to the Clerk of the

Bankruptcy Court and the Office of the United States Trustee which may have been incurred during

the Chapter 11 Case and which remain unpaid on the Confirmation Date. The Code requires that all

Administrative Expenses be paid on the Effective Date of the Plan, unless a particular claimant

agrees to a different treatment. The following chart lists all of the Debtor's unpaid Administrative

Fees and Expenses, an estimate of future Professional Fees and other Administrative Claims and fees

and their treatment under the Plan:

| Name | Estimated Amount | Treatment | Claim Type |
|---|---|---|---|
| William Mackin | $60,000.00 | The Court has already entered an order approving  $32,550.75 in fees and costs to Debtor's counsel through October 9, 2012 and $23,704.00 of this approved amount has been paid from funds in trust. The balance of all unpaid fees and costs previously awarded or to be awarded to Debtor's counsel shall be paid in full from Professional Claim Fund.  Currently Debtor's counsel has billed approximately a total of $54,000 in fees and costs. | Professional Fees |
| Weir & Partners, LLP | $30,000.00 | Paid in full from Professional Claim Fund | Professional Fees |
| Fellheimer & Eichen, LLP | $55,000.00 | Paid in full from Professional Claim Fund | Professional Fees |
| Clerk's Office Fees | $0.00 | Paid in full on Effective Date | Administrative |
| Office of U.S. Trustee Fees | $0.00 | Paid in full on Effective Date | Administrative |
| **TOTAL** | **$145,000.00** | | |

### (a)    Court Approval of Professional Compensation and Expenses Required:

The Court must approve all professional compensation and expenses. Each Professional

Person requesting compensation in the case pursuant to Sections 327, 328, 330, 331, 503(b) or 1103

of the Bankruptcy Code shall file an application for allowance of final compensation and

21

reimbursement of expenses not later than thirty (30) days after the Confirmation Date. Nothing

herein shall prohibit each Professional Person from requesting interim compensation during the

course of this case pending Confirmation of this Plan. No motion or application is required to fix

fees payable to the Clerk's Office or the Office of the United States Trustee, as those fees are

determined by statute.

### (b)      The Professional Claim Fund:

On the Confirmation Date, Debtor will place funds into the Professional Claim Fund equal

to (i) the unpaid amounts still due to Debtor's Professional Persons under all Final Orders entered

prior to the Confirmation Date approving the fee applications of such Professional Persons, (ii) the

amounts requested by Debtor's Professional Persons in filed fee applications which have not been

determined by the Court on the Confirmation Date, and (iii) the estimated amounts to be requested

by Debtor's Professional Persons in applications for allowance of final compensation and

reimbursement of expenses not later than thirty (30) days after the Confirmation Date.

### (c)      Payment From the Professional Claim Fund:

Funds to pay the unpaid amounts still due to Debtor's Professional Persons under all Final

Orders entered prior to the Confirmation Date approving the fee applications of such Professional

Persons will be released from the Professional Claim Fund within ten (10) Business Days after the

Confirmation Date.  Funds to pay the amounts approved by the Court on the fee applications of

Debtor's Professional Persons which have been filed prior to, but not determined on, the

Confirmation Date will be released from the Professional Claim Fund within ten (10) Business Days

after entry of a Final Order allowing such Professional Claim. Funds to pay the amounts approved

by the Court on final fee applications filed by Debtor's Professional Persons will be released from

the Professional Claim Fund within ten (10) Business Days after entry of a Final Order allowing such

Professional Claim.  Any funds remaining in the Professional Claim Fund after payment of all

Allowed Professional Claims will be turned over to the Reorganized Debtor for use in its operations.

### (d)        Option For Deferred Payment

Holders of Allowed Professional Claims may elect, at their option, to receive payment from

Debtor  on deferred terms and from sources other than the Professional Claim Fund.

### 2.        Section 503(b)(9) Claims:

Debtor is not aware of the existence of any Section 503(b)(9) Claims.  Any party asserting

a Section 503(b)(9) Claim must file a motion for payment with the Court, and serve such motion

upon the Debtor's counsel, and the Reorganized Debtor not later than thirty (30) days after the

Effective Date.  Uncontested Section 503(b)(9) motions will be paid by the Reorganized Debtor not

later than 10 days after the last date to file opposition to the motion was required to be filed.

Contested Section 503(b)(9) motions will be paid (in the amount Allowed by the Court) within ten

(10) Business Days of a Final Order allowing such Section 503(b)(9) Claim.

### 3.        Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by

Code Section 507(a)(8). The Bankruptcy Code requires that each holder of such a Priority Tax Claim

receive the present value of such Priority Tax Claim in regular installment payments in cash (i) of

a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Priority Tax

Claim; (ii) over a period ending not later than five years after the date of the order for relief under

11 U.S.C. §§ 301, 302, or 303; and (iii) in a manner not less favorable than the most favored

nonpriority Unsecured Claim provided for by the Plan (other than cash payments made to a Class

23

of Creditors under 11 U.S.C. § 1122(b)).

The State of New Jersey Division of Taxation has asserted an estimated Priority Tax Claim in the approximate amount of $ 500,000.00 for sales and use taxes due for the period beginning April 2011 through April 2012. Debtor has, or prior to the Confirmation Hearing will, file all past due state sales and use tax returns for these period beginning April 2011 through April 2012 which will result in the modification of this Claim to the Allowed amount of approximately $135,000.00 Debtor, at its option, will pay the State of New Jersey Division of Taxation's Allowed Priority Tax Claim either:  (a) on the tenth Business Day after entry of a Final Order allowing the State of New Jersey Division of Taxation's Priority Tax Claim; or (b) in yearly installments beginning in May 1, 2013 through May 1, 2017, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

Debtor is unaware of any other Priority Tax Claims.  However, to the extent that any other Priority Tax Claims are asserted and become Allowed Priority Tax Claims, Debtor, at its option, will pay such additional Allowed Priority Tax Claims either:  (a) on the tenth Business Day after entry of a Final Order allowing the Priority Tax Claim; or (b) in yearly installments beginning in May 1, 2013 through May 1, 2017, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

**C.      Classified Claims and Interests**

**1.      Classes of Secured Claims**

Secured Claims are Claims secured by liens on property of the estate.  The following chart lists all Classes of Creditors containing the holders of the Debtor's secured pre-petition Claims and their treatment under this Plan:

24

| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| 1 | **Secured Claim of**<br><br>**Name:** SNB<br><br>**Collateral description:** Real Property located at 300 East Evesham Ave Cherry Hill, NJ, assignment of rents and leases, personal property, equipment and inventory<br><br>**Collateral value:** $3,400,000<br><br>**Amt of Secured Claim:** $3,400,000<br><br>**Claimed priority of security int.:** First | No | Yes | Class 1 consists of SNB's Secured Claim which is secured by the Real Property and substantially all of Debtor's other property.<br><br>SNB has asserted total Claims of approximately $11.2 Million, which amount the Debtor disputes.  Debtor acknowledges that SNB holds a properly perfected first position mortgage against the Real Property and properly perfected security interests against Debtor's other assets; therefore, SNB is secured up to the value of the Real Property and Debtor's other assets, which have a value of $3,400,000. |

(a)      **Treatment of SNB's Secured Claim**:

Debtor shall pay SNB $3.4 Million in full and final satisfaction of SNB's Secured Claim on June 1, 2013. SNB shall retain its mortgage and security interests in Debtor's Real Property and other assets until payment of the $3.4 Million, at which time SNB's liens in the Debtor's Real Property and other assets shall be fully discharged.  SNB shall also share pro rata in the $200,000 fund for the payment of Class 4 Unsecured Claims to be established by the Debtor on the Effective Date.  These two payments shall fully settle and dispose of all claims and Counterclaims in the Law Division Action.  The entry of the Confirmation Order shall terminate the Foreclosure Action and the Foreclosure Appeal and shall vacate the final judgment of foreclosure previously entered in the Foreclosure Action.  If Debtor is unable to raise funds which are sufficient to fully satisfy SNB's $3.4 million Secured Claim by June 1, 2013 then Debtor will provide SNB with the indubitable

25

equivalent of SNB's $3.4 million Secured Claim consisting of a first priority mortgage in the

Debtor's Real Property and a first priority security interest in the Debtor's other assets in the amount

of $3.4 million, less any amounts paid by Debtor to SNB against SNB's Secured Claim on June 1,

2013, amortized over 40 years at 4% simple annual interest and a balloon payment due on June 1,

2018. The first monthly payment will be made on July 1, 2013 and each additional payment shall be

due on the 1st day of each succeeding calendar month.  The Debtor shall be entitled to a grace period

of 10 Business Days following receipt of written notice of any payment default arising under the

SNB Loan Documents as modified by this provision of the Plan. The SNB Loan Documents shall

be deemed amended by this provision of the Plan without need for further documentation.

### (b)  1111(b) Election by SNB

11 U.S.C. § 1111(b) permits under-secured Creditors to elect to have their entire Claim

treated as fully secured to the full extent that the Claim is Allowed even though, under section

506(a), it otherwise would be considered secured only up to the value of the collateral securing it.

An under-secured Creditor making an election under section 1111(b) forfeits its Unsecured Claim

for any deficiency and also loses the opportunity to vote its Unsecured Claim to either accept or

reject the Plan.  If SNB makes a timely  election under section 1111(b) to have its entire Claim

treated as a fully Secured Claim under the Plan, then the following treatment will apply to that

Claim:

(i)  The Law Division Action shall continue.  Within 120 days after the

disposition of the Law Division Action becomes final, SNB will be paid the lesser of $1 million or

10% of the amount determined to be owed to SNB by the Debtor in the final disposition of the Law

Division Action (the "Litigated Amount"). The balance of the Litigated Amount (the "Residual

26

Balance") will be paid over a period of not less than 40 years, in equal monthly payments such that the present value of the aggregate payments (the $1 million down-payment and the sum of the remaining payments) will be not less than $3.4 million using an imputed interest rate of 4% per annum. The first monthly payment will be made on the 1st day of the 1st full calendar month following the payment of the down-payment;

(ii)  If the Debtor sells any parcels of the Real Property (such that the remaining land does not substantially impede the continued operation of the Debtor as an 18-hole golf course), SNB shall receive at each closing an amount equal to 50% of the net proceeds from the sale; each such payment shall be applied as pre-payment of the Residual Balance. Upon remittance of each such prepayment, the amortization for payment of the then remaining Residual Balance shall be recalculated to take into account the impact of the pre-payment upon the present value calculation of the Residual Balance payment stream required to comply with §1111(b) of the Bankruptcy Code. This recalculation of the amortization schedule may, at the option of the Debtor, result in (a) the continuation of the monthly payments as originally calculated, (b) a reduction in the amount of the monthly payments and/or (c) the extension of the amortization term;

(iii)  As security for the payment of the amounts due to SNB under the §1111(b) election structure, SNB will retain its first mortgage on the Real Property, the Assignments of Rents and Leases and security interest in the Debtor's other assets that existed as of the Petition Date. The Debtor shall be entitled to a grace period of 10 Business Days following receipt of written notice of any payment default arising under the SNB Loan Documents as modified by this provision of the Plan. The SNB Loan Documents shall be deemed amended by this provision of the Plan without need for further documentation.

27

**2.       Priority Non-Tax Claims**

Certain Priority Non-Tax Claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are entitled to priority treatment. To Debtor's knowledge there are no Claims requiring payment as unsecured priority Claims under §§507(a)(3), (a)(4), (a)(5), (a)(6) or (a)(7).

**3.       Classes of General Unsecured Claims**

General Unsecured Claims are uncollateralized Claims not entitled to priority under Code § 507(a).  The following charts identify this Plan's classification and treatment of the Debtor's General Unsecured Claims.

**(a)       Administrative Convenience Claims**

Pursuant to 11 U.S.C. § 1122(b)  a plan may designate a separate Class of Claims consisting only of every Unsecured Claim that is less than or reduced to an amount that the Court approves as reasonable and necessary for administrative convenience. The following chart lists the holders of General Unsecured Claims of less than $1,000.00 each, grouped together for administrative convenience,  and their treatment under this Plan:

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 2 | **Convenience Class Claims** Amount of Claims: **$29,397.76**<br><br>Creditors in this Class are listed on attached **Exhibit C** along with the amount of Claim scheduled or contained in a timely filed proof of Claim | Y | Class 2 consists of those General Unsecured Creditors with Claim amounts of $1,000.00 or less, whose Claims are set forth in Debtor's schedules and are not marked as disputed, contingent or unliquidated, or who have filed timely proofs of claim to which there is no unresolved objection on the Confirmation Date.<br><br>**Treatment**: Creditors in this Class, who have not filed a timely proof of claim will receive 100% of the amount set forth in Debtor's schedules, without interest; Creditors in this Class who have timely filed proofs of claim will receive 100% of the amount set forth in their timely filed proof of claim without interest; payment shall be in full and final satisfaction of all Claims and shall be made in 2 separate equal installments each totaling ½ of each Claim in this Class.  The first installment will be paid within 10 days of the Effective Date.  The second installment will be paid 6 months after the Effective Date.<br><br>Class 2 is Impaired and, therefore, entitled to vote on the Plan. |

(b)  **Trade Creditors and Suppliers**

Certain trade Creditors and suppliers have General Unsecured Claims for golf clothing, golf balls, scorecards, golf equipment, and golf supplies  provided to the Debtor prior to the Petition Date and which Debtor maintains for sale in its Pro Shop. Debtor requires separate treatment of these claimants to ensure a continuation of such goods on open invoice terms after the Confirmation Date. The following chart lists the General Unsecured Claims of Debtor's trade Creditors and suppliers and their treatment under this Plan:

29

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 3 | **Trade Creditor and Supplier Class Claims**<br>Amount of Claims: **$67,298.67**<br><br>Creditors in this Class are listed on attached **Exhibit D** along with the amount of Claim scheduled or contained in a timely filed proof of claim | Y | Class 3 consists of the General Unsecured Claims of Debtor's Trade Creditors and Suppliers and whose Claims are set forth in Debtor's schedules and are not marked as disputed, contingent or unliquidated, or who have filed timely proofs of claim to which there is no unresolved objection on the Confirmation Date.<br><br>**Treatment**:  Creditors in this Class, who have not filed a timely proof of claim will receive 75% of the amount set forth in Debtor's schedules without interest; Creditors in this Class who have timely filed proofs of claim will receive 75% of the amount set forth in their timely filed proof of claim without interest; payment shall be in full and final satisfaction of all such Claims and shall be made within 10 days of the Effective Date.<br><br>Class 3 is Impaired and, therefore, entitled to vote on the Plan. |

(c)    **All Other Unsecured Claims**

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 4 | **General Unsecured Claims** Amount of Claims: **$9,546,588.74** This Class consists of all General Unsecured Claims not included in Classes 2-3, SNB's Unsecured Claim and the holders of contract/lease rejection Claims. Creditors in this Class are listed on attached **Exhibit E** along with the amount of Claim scheduled or contained in a timely filed proof of claim. General Unsecured Creditors in this Class who have not filed a timely proof of claim shall have their Claims fixed in the amount set forth on Debtor's schedules. General Unsecured Creditors in this Class who have timely filed proofs of claim shall have their Claims fixed in the amount set forth in the proof of claim. The Claims of holders of contract/lease rejection Claims shall have their Claims fixed in an amount to be determined by the Court. | Y | Class 4 consists of (i) the Claims of all General Unsecured Creditors not included in Classes 2-3 and whose Claims are set forth in Debtor's schedules and are not marked as disputed, contingent or unliquidated, or who have filed timely proofs of claim to which there is no unresolved objection on the Confirmation Date, (ii) SNB's Unsecured Claim and (iii) the holders of contract/lease rejection Claims. **Treatment:** Creditors in this Class shall share, on a pro rata basis, in a $200,000 fund to be established by Debtor on the Effective Date with payment being made in full and final satisfaction of such Claims within 60 days after the Effective Date. Class 4 is Impaired and, therefore, entitled to vote on the Plan. |

4.    **Classes of Bond Holders**

(a)    **Proprietary Indentures**.  Members who hold Proprietary Indentures are

entitled to vote on Club business at Member Meetings, are eligible to be elected to the Debtor's

Board of Governors and are eligible to serve as an Officer of the Debtor.  Upon the death of a

Member, his or her Proprietary Indenture may be transferred in accordance with the Debtor's By-

Laws and subject to the requirements of the Debtor's By-Laws, a Proprietary Indenture may be

redeemed from the proceeds of sale of new Proprietary Indentures. In order to retain their bond

interest, the existing holders of Proprietary Indentures will be required to make certain minimum

Capital Contributions to assist in funding the Plan and shall be treated as follows:

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 5 | **Proprietary Indenture Holders** | Y | Class 5 consists of the existing holders of Debtor's Proprietary Indentures.<br><br>**Required Capital Contribution to Retain Proprietary Indentures**: All existing holders of Proprietary Indentures shall be required to make a Capital Contribution of $7,500 to retain their interest.<br><br>**Timing of Capital Contributions**: A minimum payment of $2,500 will be immediately due on the execution of a pledge note prior to Plan Confirmation with the balance due in full on or before March 1, 2013, contingent on Confirmation.<br><br>**Termination of Proprietary Indentures**: Existing holders of Proprietary Indentures who do not make the required Capital Contribution shall have their Bond Interest terminated and voided upon Plan Confirmation (the "Voided Proprietary Indentures"). Holders of Voided Proprietary Indentures shall share pro rata in a $25,000 fund to be established by the Debtor (the "Voided Bond Holder Fund"), more fully discussed below.<br><br>Class 5 is Impaired and, therefore, entitled to vote on the Plan. |

       **(b)**       **Preferred Bond Holders**.  Members who hold Preferred  Bonds enjoy the

same rights and benefits as Members who hold Proprietary Indentures, along with additional rights

and benefits including but not limited to reduced Club membership dues and priority in payment of

the net proceeds of the sale of  Debtor's assets.  Preferred Bond Holders will be required to make

certain Capital Contributions to assist in funding the Plan and shall be treated as follows:

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 6 | **Preferred Bond Holders** | Y | Class 6 consists of the Debtor's existing Preferred Bond Holders<br><br>**Required Capital Contribution to Retain Preferred Bonds**: Existing Preferred Bond Holders were required to pay $20,000 for their Preferred Bonds.  Some existing Preferred Bond Holders have previously paid the full $20,000, while others have not paid the full $20,000. In order to retain their Preferred Bonds, existing Preferred Bond Holders shall be required to make a Capital Contribution in the total amount of $25,000 with credit provided for the amounts they have already previously paid to acquire their Preferred Bonds.<br><br>**Timing of Capital Contributions**: A minimum payment of $2,500 will be immediately due on the execution of a pledge note prior to Plan Confirmation with the balance due in full on or before March 1, 2013, contingent on Confirmation.<br><br>**Termination of Preferred Bonds**: Existing Holders of Preferred Bonds who do not make the required Capital Contribution shall have their Bond Interest terminated and voided upon Plan Confirmation (the "Voided Preferred Bonds").  Holders of Voided Preferred Bonds shall share pro rata in the $25,000 Voided Bond Holder Fund, more fully discussed below.<br><br>Class 6 is Impaired and, therefore, entitled to vote on the Plan. |

(c)     **The Voided Bond Holder Fund**

Debtor shall establish and fund the Voided Bond Holder Fund in the total amount of $25,000

on and after the Effective Date of the Plan. Debtor shall have 5 years from the Effective Date of the

Plan to fully fund the Voided Bond Holder Fund from the sale of new Proprietary Indentures, the sale

of new Preferred Bonds, from membership dues, from ongoing business operations or from any other

33

appropriate post-confirmation revenue source. On the date which is 5 years after the Effective Date

of the Plan Debtor shall make a one-time pro rata Distribution from the Voided Bond Holder Fund

to the holders of Class 5 Voided Proprietary Indentures and Class 6 Voided Preferred Bonds in full

and final satisfaction of such Voided Bond Interests.

**D.      Means of Effectuating the Plan**

**1.      Funding for the Plan**

The Plan will be funded by Capital Contributions and loans from Debtor's Bond Holders and

Members and the ongoing business operations of the Debtor or the Reorganized Debtor.

**(a)      Capital Contributions From Existing Bond Holders**

The Capital Contribution requirements for the existing holders of Proprietary Indentures  is

set forth above in the chart discussing the treatment of Class 5 Bond Holders.  The Capital

Contribution requirements for the existing holders of Preferred Bonds is set forth above in the chart

discussing the treatment of Class 6 Bond Holders.

**(b)      Capital Contributions from New Proprietary Indenture Holders**

Those Members of the Debtor who wish to become the Holder of a Proprietary Indenture

must make a Capital Contribution of $7,500.  A minimum of $2,500 will be immediately due on the

execution of a pledge note prior to Plan Confirmation with the balance due in full on or before

March 1, 2013.  These new Proprietary Indentures shall only be issued if the Debtor's chapter 11

Plan is confirmed and will be issued not later than 60 days after the Effective Date of the Confirmed

Plan.

**(c)      Capital Contributions from New Preferred Bond Holders**

Those Members of the Debtor who wish to become the Holder of a Preferred Bond must

make a Capital Contribution of $25,000. A minimum of $2,500 will be immediately due on the execution of a pledge note prior to Plan Confirmation with the balance due in full on or before March 1, 2013. These new Preferred Bonds shall only be issued if the Debtor's chapter 11 Plan is confirmed and will be issued not later than 60 days after the Effective Date of the Confirmed Plan.

### (d) The Member Mortgage

The existing holders of Class 5 Proprietary Indentures who make the required Capital Contributions, the existing holders of Class 6 Preferred Bonds who make the required Capital Contributions and Members of the Debtor who make the required Capital Contribution to acquire new Proprietary Indentures or new Preferred Bonds (the "Eligible Bond Holders") are also eligible to make additional contributions to the Debtor as loans to be secured by a mortgage on the Debtor's Real Property (the "Member Mortgage"). Eligible Bond Holders may contribute a minimum of $50,000 toward the Member Mortgage. Each Eligible Bond Holder must immediately, and prior to the Confirmation Hearing, execute a pledge note and pay a minimum of 10% of the amount they pledge to contribute toward the Member Mortgage with the balance due in full on or before June 1, 2013, contingent on Confirmation.

The Member Mortgage will be subordinate only to SNB's mortgage lien in the Debtor's Real Property. When the full amount of SNB's Secured Claim has been paid by the Debtor, SNB's mortgage liens and other liens shall be fully discharged and the Member Mortgage shall have first priority in the Debtor's Real Property and other assets. SNB shall be required to execute all documents necessary to discharge and release all of its liens in the Debtor's Real Property and other assets upon full payment of SNB's Secured Claim and shall otherwise be required to cooperate with Debtor in discharging and releasing all such liens.

Contributors to the Member Mortgage will receive interest payments only for 10 years following the Effective Date of the Plan.  Contributors to the Member Mortgage will receive interest payments equal to  3% simple interest per annum for the first 2 years following the Effective Date of the Plan.  The annual interest rate shall be reevaluated by the Debtor's Board of Directors at the end of the second year and may be adjusted as is appropriate, but the annual interest rate shall never be less than 3%.  The Member Mortgage is due in full in 10 years or upon sale or refinance of the Debtor's Real Property.  There shall be no requirement for any payments or Distributions of interest or principal under the Member Mortgage, nor shall the Member Mortgage become a lien on Debtor's Real Property or other assets unless Debtor's chapter 11 Plan is confirmed.

(e)    <b>The Plan Funding Escrow Account</b>

All Capital Contributions made by existing holders of Proprietary Indentures, by existing holders of Preferred Bonds, by Members of the Debtor acquiring new Proprietary Indentures, by Members of the Debtor acquiring new Preferred Bonds and all loan contributions made by Eligible Bond Holders toward the Member Mortgage shall be held in a separate non-interest bearing escrow account by the Debtor's Treasurer or Counsel (the "Plan Funding Escrow Account"). All monies deposited into the Plan Funding Escrow Account are not to be disbursed unless in connection with the consummation of the Debtor's confirmed chapter 11 Plan.  In the absence of Confirmation of the Debtor's chapter 11 Plan by July 1, 2013, or such later date as may be fixed pursuant to a revised Plan, all monies in the Plan Funding Escrow Account shall be returned to the contributing Bond Holders or Members without interest.

Debtor's Capital Contribution campaign goal is to raise a minimum of $4.5 million for the Plan Funding Escrow Account to fund all required Plan payments and to establish an operating

capital reserve fund of approximately $500,000.  As of January 18, 2013, Debtor's Counsel had received *initial deposits* totaling $102,500.00 from existing holders of Proprietary Indentures, from existing holders of Preferred Bonds, from Members of the Debtor acquiring new Proprietary Indentures, from Members of the Debtor acquiring new Preferred Bonds and from Member Mortgage contributions made by Eligible  Bond Holders toward the Member Mortgage, all of whom had executed Pledge Notes with a current face value of at least $722,500.00 as reflected in **Exhibit F**. These initial deposits have been placed into the Plan Funding Escrow Account.  Debtor's Capital Contribution campaign will continue.

**(f)**     **Funding for the Professional Claims Fund**.

The Debtor or the Reorganized Debtor will fund the Professional Claim Fund on the Confirmation Date from the Plan Funding Escrow Account and ongoing business operations to pay the Allowed Professional Claims.

**(g)**     **Allowed Administrative Expenses (other than Professional Claims)**

Allowed Administrative Expenses (Other than Professional Claims) will be paid from the Plan Funding Escrow Account and the ongoing business operations of the Debtor or the Reorganized Debtor.

**2.**     **Post-Confirmation Management**

Upon the Effective Date, the Reorganized Debtor will be responsible for any Distributions under the Plan pursuant to 11 U.S.C. § 1123.  The Reorganized Debtor will also have the responsibility to initiate and/or conclude any objections to Claims and pursue any Causes of Action whether or not discussed in the Disclosure Statement or listed in Debtor's schedules or statements of financial affairs.  The Reorganized Debtor will not be required to obtain a bond in relation to this

37

function.   The Reorganized Debtor will be responsible for payment of its expenses, including

expenses of its retained professionals who shall be paid reasonable hourly fees for services rendered

and reasonable expenses incurred pursuant to the Plan.   The Reorganized Debtor will not be required

to obtain Court authority for such retention nor have to obtain Court approval for their fees and

expenses.   Management of Debtor's operations after the Effective Date will continue to be run by

the Debtor's board of directors.   Debtor will hold post-confirmation elections pursuant to its by-laws

to elect its officers and Board.

### 3.      Disbursing Agent

The Reorganized Debtor shall act as the Disbursing Agent for the purpose of making all

Distributions required under the Plan

### E.      Other Provisions of The Plan

### 1.      Executory Contracts and Unexpired Leases

#### (a)      Assumptions

The following chart lists the Executory Contracts and unexpired leases which shall be

assumed by the Debtor and the treatment of each:

| Contracts and Leases to be Assumed by Debtor | Treatment |
|---|---|
| Club System Group - Website Management Software Service Agreement<br><br>Go Daddy - Website Hosting Contract<br><br>Performance Golf Management - Course Maintenance Contract<br><br>Pitney Bowes Global Fin Serv - Postage Machine Lease<br><br>PNC Equipment Finance - Maintenance Equipment Lease<br><br>Textron Financial - Lease for Grounds Keeping Equipment<br><br>Yamaha Motor Corp - Lease of Golf Carts | Debtor shall assume each of these contracts and leases and continue to perform its duties and obligations thereunder.  Debtor shall cure all pre-petition arrears in the amounts set forth in timely filed proofs of claim by all Members of this Class, or in the absence of a timely filed proof of claim, in the amounts set forth in Debtor's schedules as follows:<br><br>All pre-petition arrears will be cured in full without interest as follows: (i) 25% on or before May 31, 2013; (ii) 25% on or before November 30, 2013; (iii) 25% on or before May 31, 2014, and (iv) 25% on or before November 30, 2014.  The Debtor may, at its own election, provide full payment to cure pre-petition arrears at such earlier times as may be convenient. |

All Executory Contracts and unexpired leases, except for those specifically listed in the chart above, previously assumed by the Debtor in writing or previously assumed by Court Order, shall be deemed rejected.  All proofs of claim with respect to Claims arising from said rejection must be filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing Claims in any Order of the Bankruptcy Court approving such rejection or (ii) thirty (30) days after the Confirmation Date. Any such Claims, proofs of which are not filed timely, will be barred forever from assertion.

On the Effective Date, each of the unexpired leases and Executory Contracts listed above shall be assumed as obligations of the Reorganized Debtor .   The Order of the Court confirming the Plan shall constitute an Order approving the assumption of each lease and contract listed above.  If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objection to the confirmation of the Plan.

### (b) Rejections

On the Effective Date, all Executory Contracts not assumed shall be deemed to be rejected. The Order confirming the Plan shall constitute an Order approving the rejection of the lease or contract. If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

Any Claims based on the rejection of an Executory Contract or unexpired lease will be barred if the proof of Claim is not timely filed, unless the Court later orders otherwise.

**THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT IS THE LATER OF THE BAR DATE OR THIRTY DAYS AFTER THE EFFECTIVE DATE OF THE DEBTOR'S REJECTION OF THE EXECUTORY CONTRACT.**

### 2. Changes in Rates Subject to Regulatory Commission Approval

This Debtor is not subject to governmental regulatory commission approval of its rates.

### 3. Retention of Jurisdiction

The Court shall retain jurisdiction of this case pursuant to the provisions of Chapter 11 of the Bankruptcy Code, pending the final allowance or disallowance of all Claims affected by the Plan, and with respect to the following matters:

(a) To enable Debtor to consummate the Plan and to resolve any disputes arising with respect thereto;

(b) To enable the Debtor to consummate any and all proceedings which it may bring prior to the entry of the Order of confirmation, to set aside liens and encumbrances, and to recover any preferences, transfers, assets or damages to which it may be entitled under applicable provisions of the Bankruptcy Code or other federal, state

or local law.

(c)     to adjudicate all controversies concerning the classification or allowance of any Claim or Equity Interest.

(d)     to hear and determine all Claims arising from the rejection of any Executory Contracts, including leases, and consummate the rejection and termination thereof or with respect to any Executory Contracts to which an application for rejection or termination is filed prior to entry of the Order of confirmation.

(e)     To liquidate damages in connection with any disputed, contingent or unliquidated Claims.

(f)     To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof.

(g)     To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by the Debtor during the pendency of the within proceedings.

(h)     To recover all assets and properties of the Debtor wherever located.

(i)     To adjudicate and determine any Cause of Action provided for under the Plan.

(j)     To make such orders as are necessary or appropriate to carry out the provisions of this Plan.

(k)     To enter a final decree closing this Chapter 11 Case.

In addition, the Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under § 1142, sub-paragraphs (a) and (b) of the Bankruptcy Code.  If the Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in this section, or if the Debtor or the Reorganized Debtor elect to bring an action or proceeding in any other forum, then this section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public authority or commission having competent jurisdiction over such matters.

4.       **Procedures for Resolving Contested Claims**.

Objections to Claims and Interests, except for those Claims more specifically deemed Allowed in the Plan, may be filed by the Reorganized Debtor or any party in interest up to and including sixty (60) days after the Confirmation Order becomes a final non-appealable order.  With respect to disputed Claims or Interests, the Disbursing Agent will hold in a separate interest bearing reserve account such funds as would be necessary in order to make the required Distribution on the Claim or Interest, as listed either in the Debtor' schedules or the filed proof(s) of Claim.

5.       **Effective Date**

The Plan will become effective on the Effective Date which is fourteen days after entry of the Confirmation Order.

6.       **Modification**

Debtor may alter, amend or modify the Plan at any time prior to the Confirmation Hearing and thereafter as provided in section 1127(b) of the Bankruptcy Code.

7.       **Notices under the Plan**

All notices, requests or demands with respect to this Plan shall be in writing and shall be deemed to have been received within five (5) days of the date of mailing, provided they are sent by registered mail or certified mail, postage prepaid, return receipt requested, and if sent to the Proponent, addressed to:   William Mackin, Esq., 105 N. Broad Street, Woodbury, NJ 08096 .

F.       **Tax Consequences of Plan**

**CREDITORS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  DEBTOR IS UNAWARE OF ANY TAX ISSUES THAT THE PLAN**

42

**PRESENTS TO DEBTOR**.  Debtor **CANNOT** and **DOES NOT** represent that the tax consequences contained herein are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.  In accordance with the Plan, holders of Allowed Unsecured Claims shall receive Distributions from the Reorganized Debtor in full and final satisfaction of such Claims. Each holder of an Allowed Unsecured Claim will recognize gain or loss upon receipt of such Distributions.  Any gain or loss realized by a Creditor should constitute ordinary income or loss to such Creditor unless such Claim is a capital asset.  If a Claim is a capital asset, and it has been held for more than one year, such Creditor will realize long term capital gain or loss.

The tax consequences to Creditors will differ and will depend on factors specific to each such Creditor, including but not limited to:  (i) whether the Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Claim, (iii) the type of consideration received by the Creditor in exchange for the Claim, (iv) whether the Creditor is a United States Person or a foreign Person for tax purposes, (v) whether the Creditor reports income on the accrual or cash basis method, and (vi) whether the Creditor has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH CREDITOR. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  THEREFORE IT IS IMPORTANT THAT EACH CREDITOR OBTAIN ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN.**

### G.    Exculpation

Debtor, the Reorganized Debtor, and their respective board members, officers, directors, employees, attorneys, accountants, financial advisors, and agents (but only in their capacity as such) shall not have, or incur, any liability to any holder of a Claim for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the Reorganized Debtor or the property of the Estate, except for willful misconduct or gross negligence, and, in all respects, Debtor, the Reorganized Debtor and their respective board members, officers, directors, employees, attorneys, financial advisors, and agents shall be entitled to rely upon the advise of counsel with respect to their duties and responsibilities under the Plan.

### H.    Section 1146 Exemption

Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, including, without limitation, the transfers to be made under Article III above, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held, to be a stamp tax or other similar tax by applicable law. Expressly included in this exemption are any sales of Real Property in furtherance of Article III, C, 1(c).

I.      **Heading, Article and Section References**

The headings in this Disclosure Statement are for convenience of reference only and shall

not limit or otherwise affect the meaning of the terms used in the Plan.

J.      **Severability**

Should any provision of the Plan be determined to be unenforceable following the Effective

Date, such determination shall in no way limit or affect the enforceability of any and all other

provisions of the Plan.

K.      **Successors and Assigns**

The rights, duties and obligations of any Person named or referred to in the Plan shall be

binding upon, and shall inure to the benefit of the successors and assigns of such Person.

L.      **Payment Default**

Unless otherwise provided herein, no default will be declared under the Plan unless any

payment due thereunder is not made within thirty days after the due date for such payment and upon

thirty days written notice to the Debtor or the Reorganized Debtor as the case may be with an

additional thirty day cure period.

M.      **Presentation of Plan Distributions, Undeliverable Distributions**

Any Person who receives a check pursuant to the Plan must present such check for payment

within 60 days of its date of issuance.  Any checks not presented within such 60 day period will be

void.  If the Reorganized Debtor is unable to effect delivery of a payment to the holder of an Allowed

Claim the undeliverable Distribution to a Holder of an Allowed Claim in any Class shall be deemed

unclaimed property within 11 U.S.C. § 347(b) at the expiration of a 60 day period.  Pursuant to Local

Rule 3011-1(a), all such undeliverable Distributions shall be distributed into the Court's registry

45

without further Court order.

**N.    De Minimus Distribution**

The Reorganized Debtor will make no Distribution of less than $25.00 to any Creditor unless a request is made in writing to the Debtor or Reorganized Debtor.

**O.    Waiver of Avoidance Actions**

Upon the Effective Date, all rights of the Debtor and the Reorganized Debtor on their own behalf and on behalf of the estate to commence and/or prosecute Avoidance Actions are irrevocably released, waived and discharged.  Debtor has reviewed the payments made to Creditors during the 90 days prior to the Petition Date and to Insiders during the one year prior to the Petition Date and believes that the potential defendants would have substantial affirmative defenses.  For these reasons, Avoidance Actions have little or no value to its estate.

**P.    Retention, Enforcement and Waiver of Claims**

Except as provided otherwise in the Plan, Debtor and its estate shall retain, and the Reorganized Debtor pursuant to 11 U.S.C. § 1123 on behalf of Debtor and its estate shall enforce, any and all claims of Debtor and/or the debtor-in-possession, including Avoidance Actions.  Upon notice and consent or entry of a Final Order, the Reorganized Debtor shall direct the prosecution, settlement or other compromise of any proceeding commenced in the exercise of its authority under the Plan.  Upon Notice and Consent or Entry of a Final Order, the proceeds of any recovery shall be distributed according to the terms of the Plan.

**Q.    Risk Factors**

The following discussion is intended to be a non-exclusive summary of certain risks attendant upon the consummation of the Plan.  You are encouraged to supplement this summary with your

46

own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors.  Based on the analysis of the risks summarized below, Debtor believes that the Plan is viable and will meet all requirements of confirmation.  Because of the funds available at the time of confirmation and the minimal amount of anticipated Administrative Expenses, Debtor does not foresee any risk in insufficient funds being available on the Effective Date.

There are several other risks the parties in interest should consider, including that Debtor's future operations will continue to be of a seasonal nature.  Debtor's revenues derived from membership dues are dependent on the number of Club Members and their level of membership.  Such revenues are largely received during a 6 month period beginning in March of each year, although revenues from parties and other events held at the Debtor's clubhouse are received during the full calendar year. Since the Petition Date Debtor's membership has increased and Debtor intends to take actions to continue the membership level which is at least at the same level in 2013 and future years.  Further, Debtor has experienced an increase in event bookings with the stability provided by the Chapter 11 reorganization process, and Debtor will continue to seek additional event bookings in 2013 and future years.  Therefore, Debtor submits that the risk of decreased revenue is minimal.

Internal changes that have already been implemented will allow Debtor to operate more profitably going forward.  Debtor believes these improvements will continue after the Effective Date and in the future.

**R.     Acceptance or Rejection of Plan**

Each Impaired Class of Creditors with Claims against the Debtor's estate shall be entitled

47

to vote separately to accept or reject the Plan. A Class of Creditors shall have accepted the Plan if the Plan is accepted by at least two-thirds in the aggregate dollar amount and more than one-half in number of holders of the Allowed Claims of such Class that have accepted or rejected the Plan. In the event that any Impaired Class of Creditors or Interest holders shall fail to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, the Proponent reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

## IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.   The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be proposed in good faith, that Creditors have accepted the Plan, that the Plan pays Creditors at least as much as they would receive in a Chapter 7 liquidation, and that the Plan is feasible.  These requirements are not the only requirements for confirmation.

## A.   Who May Vote or Object

### 1.   Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below not

everyone is entitled to vote to accept or reject the Plan.

### 2. Who May Vote to Accept/Reject the Plan

A Creditor has a right to vote for or against the Plan if that Creditor has a Claim that is both

(1) Allowed or Allowed for voting purposes and (2) classified in an Impaired Class.

### 3. What Is an Allowed Claim

As noted above, a Creditor must first have an Allowed Claim to have the right to vote.

Generally, any proof of claim will be Allowed, unless a party in interest brings a motion objecting

to the Claim.  When an objection to a Claim is filed, the Creditor cannot vote unless the Court, after

notice and hearing, either overrules the objection or allows the Claim for voting purposes.

### 4. What Is an Impaired Claim

An Allowed Claim only has the right to vote if it is in a Class that is Impaired under the Plan.

A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that

Class.  For example, a Class comprised of General Unsecured Claims is Impaired if the Plan fails

to pay the members of that Class 100% of their Claim, plus interest.

Debtor believes that Classes 1 through 8 are Impaired and that holders of Claims in these

Classes are therefore entitled to vote to accept or reject the Plan.  Debtor believes that there are no

Unimpaired Classes.  Parties who dispute Debtor's characterization of their Claim as being Impaired

or Unimpaired may file an objection to the Plan contending that Debtor has incorrectly characterized

that Class.

### 5. Who Is Entitled to Vote

The following four types of Claims are not entitled to vote under the Plan:  (a) Claims in

Unimpaired Classes; and (b) Claims in Classes that do not receive or retain any value under the Plan.

49

Claims in Unimpaired Classes are not entitled to vote because such Classes are deemed to have

accepted the Plan.  Claims entitled to Priority pursuant to Bankruptcy Code Section 507(a)(1), (2),

and (7) are not entitled to vote because such Claims are not placed in Classes and they are required

to receive certain treatment specified by the Bankruptcy Code.  EVEN IF YOUR CLAIM IS OF THE

TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE

CONFIRMATION OF THE PLAN.

     **6.**     **Completing and Returning Ballot**

Holders of Claims entitled to vote on the Plan received a ballot with the Disclosure

Statement.  All votes to accept or reject the Plan must be cast by using the ballot enclosed with the

Disclosure Statement (or manually executed copies thereof).  No other votes will be counted.

Please fill out the ballot and return it to:

William Mackin, Esquire
105 N. Broad Street
Suite 1
Woodbury, NJ 08096

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND <u>ACTUALLY

RECEIVED</u> BY DEBTOR AT THE ABOVE ADDRESS on or before the Voting Deadline, which

is 4:00 p.m. (Eastern Time) on _____ 201___ which deadline may be extended only by Debtor or

the Court.  If delivery is by mail, allow enough time to ensure timely delivery.  Ballots received after

the Voting Deadline will not be counted in the voting unless Debtor extends the Voting Deadline,

or the Court so orders.  If you have any questions about procedures for voting, or if you did not

receive a ballot, received a damaged ballot or have lost your ballot, or have any questions about the

50

Plan or Disclosure Statement please call (856) 848-2152 and leave a message stating the case name, your name and a phone number where you can be reached.

Unless the ballot being furnished with this Disclosure Statement is timely submitted on or prior to the Voting Deadline, Debtor may reject such ballot as invalid and, therefore, decline to utilize it in connection with seeking confirmation of the Plan by the Court.

### 7.    Revocation of Ballots

Notwithstanding Bankruptcy Rule 3018(a), a Claimant that has previously cast a ballot may change or re-cast its ballot prior to the above deadline.  However, only the last timely filed ballot received from a Claimant will be considered.  Thereafter, ballots may only be changed or revoked by order of the Court.

### 8.    Who Can Vote in More Than One Class

A Creditor whose Claim is Allowed partially in one Class and partially in another Class is entitled to accept or reject a Plan in both capacities by casting one ballot for each Class in which it holds a Claim.

### 9.    Incomplete Ballots

Any ballot received that does not indicate either an acceptance or rejection of the Plan will be deemed as an acceptance of the Plan.

### 10.    Waivers of Defects, Irregularities, Etc.

Unless otherwise ordered by the Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by Debtor in its sole discretion.  Debtor reserves the right to contest the validity of any revocation or withdrawal.  Debtor also reserves the right to reject any and all ballots not in proper form, the

51

acceptance of which would, in Debtor's opinion, be unlawful or prejudicial.  Debtor further reserves

the right to waive any defects or irregularities or conditions of delivery as to any particular ballot.

Debtor's interpretation, unless otherwise ordered by the Court, will be final and binding on all

parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be

cured within such time as Debtor (or the Court) determines.  Neither Debtor nor any other Person

will be under any duty to provide notification of defects or irregularities with respect to deliveries

of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless

otherwise directed by the Court, delivery of such ballots will be deemed not to have been made until

such irregularities have been cured or waived.

### 11.    Votes Necessary to Confirm the Plan

The Court cannot confirm the Plan unless (a) all Impaired Classes have voted to accept the

Plan or (b) if at least one Impaired Class has accepted the Plan without counting the votes of any

insiders within that Class, the Plan is eligible to be confirmed by "cramdown" on non-accepting

Classes, as discussed below.

### 12.    Votes Necessary for a Class to Accept the Plan

A Class is considered to have accepted the Plan when more than half in number and at least

two-thirds in dollar amount of the Allowed Claims that actually voted, voted in favor of the Plan.

### 13.    Treatment of Nonaccepting Classes

As noted above, even if all Impaired Classes do not accept the proposed Plan, the Court may

nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the

Bankruptcy Code.  The process by which nonaccepting Classes are forced to be bound by the terms

of the Plan is commonly referred to as "cramdown".  The Bankruptcy Code allows the Plan to be

"crammed down" on nonaccepting Classes if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) if one non-insider Impaired Class accepts the Plan and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 14.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

Debtor will request that the Court confirm this Plan by cramdown on Impaired Classes if any of these Classes do not vote to accept the Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, a Claimant in an Impaired Class that does not vote to accept the Plan, must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured Claims are paid first from the sale proceeds of assets on which the Secured Creditor has a lien. Administrative Expenses are paid next. Next, unsecured Creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured Creditors with the same priority share in proportion to the amount of their Allowed Claims.

In order for the Court to be able to confirm this Plan, the Court must find that all Creditors who do not accept the Plan will receive at least as much under the Plan as such they would receive under a Chapter 7 liquidation. Debtor submits that this requirement is met because the Plan provides for the payment of the following percentages or amounts to the Holders of Claims in the following Classes which percentage or amount is greater than Unsecured Creditors in any of the following

Classes would expect under a Chapter 7 liquidation:

| Class | Description | % or amt of Claim to be paid under Plan | % or amt of Claim to be paid through liquidation |
|---|---|---|---|
| 2 | Administrative Convenience Claims | 50% | 0% |
| 3 | Trade Creditors and Suppliers | 75% | 0% |
| 4 | General Unsecured Claims not in Classes 2-3 and lease rejection Claims | pro rata Distribution from $200,000 fund | 0% |
| 5 | Existing Preferred Bond Holders | Will retain Bond interest if required Capital Contribution is made; will share pro rata in post-confirmation $25,000 Voided Bond Holder Fund if Capital Contribution is not made | 0% |
| 6 | Existing Holders of Proprietary Indentures | Will retain Bond interest if required Capital Contribution is made; will share pro rata in post-confirmation $25,000 Voided Bond Holder Fund if Capital Contribution is not made | 0% |

A conversion to Chapter 7 would also add a layer of Professional Claims to this case for the trustee's attorneys, accountants and other professionals as well as the trustee's commission which would likely result in significantly less funds being available for Distribution to Unsecured Creditors in Chapter 7.

Thus, all Creditors will receive more under the Plan than they would under Chapter 7. Attached as **Exhibit G** is a liquidation analysis that shows that Creditors would likely receive no Distribution on their Claims in liquidation versus the amounts or percentages set forth in the chart above under the Plan.  Therefore, Creditors will receive at least as much under the Plan as they

would under a Chapter 7 liquidation.[3]

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that

confirmation of the Plan is not likely to be followed by the liquidation or the need for further

financial reorganization of Debtor unless such liquidation or reorganization is proposed in the Plan.

As discussed above, Debtor has implemented numerous procedures to improve its membership and

income.  Furthermore, the Debtor will continue to seek to attract additional events and bookings as

the decline in the number of events and bookings due to the well-publicized problems between the

Debtor and SNB prior to the Chapter 11 filing was a contributing factor to Debtor's financial

difficulties and the need to file the Chapter 11 Case. These changes along with reduction in operating

expenses and a reduction of payment obligations to pre-petition Creditors will enable Debtor to

continue operations going forward.

There are at least two other important aspects of a feasibility analysis.  The first considers

whether Debtor will have enough cash on hand on the Effective Date to pay all the Claims and

---

[3]  Debtor has not obtained a separate liquidation value for its assets. Debtor's Plan proposes retention of its assets and continuation of its business operations, therefore the proper standard for valuing Debtor's assets under the Plan, as contained in the GPA Appraisal, is that set forth in In re Heritage Highgate, Inc., 679 F.3d 132 (3d Cir. 2012) which requires valuation based on Debtor's continued use of its assets as a member-owned, not-for-profit Golf Course and Country Club.  Without a separate liquidation value Debtor has, for the purposes of illustrating the likely result under a chapter 7 liquidation scenario, identified the "liquidation value" of Debtor's assets in **Exhibit G** as the same value set forth in the GPA Appraisal.  The actual liquidation value of Debtor's assets may be higher or lower than the GPA Appraisal. SNB believes liquidation of the Debtor's Club facilities and assets, without regard to any particular use, may be higher than the $3.4 Million value set forth in the GPA Appraisal. However SNB has not produced an appraisal supporting its position and, in any event, acknowledges that the liquidation value will be insufficient to satisfy SNB's claim in full. Even if SNB's notion of liquidation value is correct, there will not be any funds available for any other creditors other than SNB upon a liquidation.

Administrative Expenses that are entitled to payment at that time.  Debtor maintains that this aspect

has been satisfied because Debtor has remained current with all operating expenses since the Petition

Date.  This coupled with funds on hand on the Effective Date will ensure sufficient funds to pay all

Administrative Expenses and to make all Distributions required on the Effective Date.

The second aspect considers whether Debtor will have enough cash over the life of the Plan

to make the required Plan payments.  Attached as **Exhibit H** is Debtor's projections showing

operations for five years after the Effective Date.  The forecast shows that Debtor's continued

operations are likely and that it should have sufficient funds to make all payments required under the

Plan, including amounts necessary to make Distributions to Class 1 through 4 Creditors under the

Plan.  Debtor notes that although it does not presently have a source of short term financing, it

projects having sufficient funds on hand to enable it to operate through the off-season and to fund

its preparation for operations in the 2013 season and beyond.  Debtor intends to increase events and

bookings for the 2013 season and therefore anticipates no cash flow issues during the off-season.

In summary, the Plan provides that all Distributions to Unsecured Creditors will be made

within 5 years of the Effective Date, at the latest.  Debtor contends that the financial projections for

continued operations are feasible because they are based on Debtor's historical operations and fixed

costs which are adjusted to reflect cost saving measures and improved cash flow procedures put in

place.

## V.    EFFECT OF CONFIRMATION OF PLAN

**A.    Discharge**

This Plan provides that upon confirmation of the Plan, Debtor shall be discharged of liability

for payment of the Debts incurred before confirmation, to the extent specified in 11 U.S.C. § 1141.

56

However, any liability imposed by the Plan will not be discharged.  If confirmation of this Plan does

not occur or if, after confirmation occurs, the Debtor elects to terminate the Plan, the Plan shall be

deemed null and void.  In such event, nothing contained in this Plan shall be deemed to constitute

a waiver or release of any Claims against the Debtor or its estate or any other Persons, or to prejudice

in any manner the rights of the Debtor or its estate or any Person in any further proceeding involving

the Debtor or its estate.  The provisions of this Plan shall be binding upon Debtor, all Creditors and

all Interest holders, regardless of whether such Claims or Interest holders are Impaired or whether

such parties accept this Plan, upon confirmation thereof.

**B.      Revesting of Property in the Debtor**

Except as provided elsewhere in this Disclosure Statement and except as provided elsewhere

in the Plan, the confirmation revests all of the property of the estate in the Reorganized Debtor.

**C.      Confirmation Injunction**

On and after the Effective Date, except to enforce the terms and conditions of the Plan before

the Court, or as permitted under an order of the Court, all Persons or entities who have held, hold

or may hold any Claim against Debtor are, with respect to any such Claim, permanently enjoined

from and after the Effective Date from:  (a) commencing, conducting or continuing in any manner,

directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation,

any proceeding in a judicial, arbitral, administrative or other forum) against the Reorganized Debtor

or any of its properties, or any direct or indirect transferee of any property of, or direct or indirect

successor in interest to, any of the foregoing Persons or entities and all of their respective direct and

indirect parents, subsidiaries and affiliates, together with each of their respective shareholders,

Members, managers, general partners, limited partners officers, directors, employees, agents,

representatives, attorneys and advisors or consultants or any property of any of the foregoing (collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, against any of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of the Protected Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any of the Protected Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan.

### D.      Modification of Plan

The Proponent of the Plan may modify the Plan at any time before confirmation.  However, the Court may require a new Disclosure Statement or re-voting of the Plan if Proponent modifies the Plan before confirmation.

The Proponent may also seek to modify the Plan at any time after confirmation as long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modification after notice and a hearing.  Proponent further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

### E.      Post-Confirmation Conversion/Dismissal

A Creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing under the Plan.  If the Court

orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan or pursuant to Court Order, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during this case.

**F.      Post-Confirmation Quarterly Fees**

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-Confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree.  In order to determine the proper post-Confirmation fee, for each month (or portion thereof) after Confirmation that the case remains open, Debtor will file summary monthly reports with the Court and serve a copy on the Office of the United States Trustee.  These reports will be submitted in the format provided by the Office of the United States Trustee. Debtor will be responsible for timely payment of all post-Confirmation quarterly fees.

Dated: January 18, 2013                              Woodcrest Country Club


                                                     By: /s/ Irvin Richter
                                                     Irvin Richter, President

Z:\1759wm\Plan and DS\DS\Most recent Version of DS\WCC First Amended Disclosure Statement.v6.1.18.13.wpd